Good morning, Your Honor. I may please the court. My name is Tony Durando. I'm here on behalf of Plaintiff Appellants Kimble and Graham. Counsel, you know that we will hear argument in Marvel v. Kimble next, so I'm going to ask counsel for both sides to try to avoid duplication if you can. I gather you're going to concentrate on the issue in your case, and then there will be a separate argument on the second issue. All right. Very well. The question before the court today, in my part of the case, is whether the agreement, the provision for royalties in the settlement agreement between the parties, is in violation of the landmark case of Brulotte, 1954. That case stands for the proposition that a patent monopoly should not be extended past the expiration of the patent in question. You know, this court, in the Zila case, defined the holding of Brulotte, quoting, simply put, Brulotte indicates that under some circumstances, patent owners cannot exact royalties for use of patented devices beyond the duration of their patents. Well, so Brulotte existed at the time of the settlement agreement, correct? Yes. And so did people just not, oops, didn't know about it, or what? We don't know. But Zila came after the settlement agreement. Yes. But even at the time of the settlement agreement, there were other cases in other circuits that somehow gave some sort of indication that maybe you should have a discounted royalty rate for the period after the patent expires, right? And none of that was done here. Well, in fact, it's not only discounted. It's depending on how you read the provisions. We got a two-prong provision, one that clearly applies only to patented devices, the other one that clearly applies to non-patented devices. That was the web blaster that was part of the original lawsuit between the parties. It's the one, the web blaster was produced for, I think, about 15 years, and royalties were paid under that prong of the provision. And Marvel has admitted in pleadings that that product does not violate, was not patented, was not covered by the patent. So whichever way we look at that provision, the portion that applies to patented devices goes away at the expiration of the patent. There are two classes of product that is being produced. The briefs, Marvel's briefs refer to these two classes of products three times. One is the class that is covered by the patent. The other one is the class that is not covered by the patent. We are not saying that we should be getting a payment of a royalty for a product that is covered by the patent, which would be clearly a violation of the law. All we're saying is that there is a clear distinction between the two, which is not, by the way, a violation, does not make it a hybrid agreement as Well, okay, but really, when the settlement came up here, you lost on the summary judgment, right? The court ruled against you on the patent violation on the summary judgment, then the rest went to a jury trial, and you won on the verbal agreement. So then from there, Marvel appeals the verbal agreement, you appeal the patent agreement, and so you come up with this settlement. So you both have, and everyone knows that appeals don't always come out the way that the district courts. If you want to look at statistics, probably summary judgments are reversed about a third of the time, and the jury verdicts are a little bit harder to overturn. So both of you go in with a little bit of leverage either way. So why isn't this a hybrid agreement? Well, that would be a question of leverage and not a question of hybrid agreement, because the hybrid agreement is like in the Pitney Bowes case. Hybrid agreements are the ones that deal with a product that incorporates both patented subject matter and non-patent subject matter. And why isn't that true in this case? Because in this case, there are two classes of products. The first prong of the agreement only covers patented subject matter. The second prong, the one that plaintiffs have been collecting royalties for during the term of the patent, only deals with the web blaster, which has been admitted not to be covered by the patent. What we're saying is that that prong, that prong of the provision, survives the termination of the expiration of the patent. There is no patent monopoly that is continued after the expiration of the patent by paying a royalty for a product that is not patented past the expiration of a patent that has got nothing to do with the product. Really, because it never covered that patent. That product, the web blaster, was never protected by the monopoly of the patent. A competitor could have made a... Well, but you thought it was. That's how you brought the original lawsuit, right? You just lost on summary judgment and you were appealing. You weren't really conceding that. You were still, if you hadn't had a settlement, you were still going to try to say that it was. Well, except that at that point, and this is where the leverage argument comes in. At that point, we were looking at a jury verdict that had found that the web blaster was covered by the verbal agreement and had awarded a three and a half percent royalty. We were, my clients were looking at a situation where chances that that would be reversed, a unanimous jury had found, as a matter of fact, that had been a breach of contract and had awarded a three and a half percent royalty. On the other side was a patent that had been found on summary judgment not to have been violated. As a result of the settlement... You stepped it down a little bit, didn't you? You stepped it down to three percent. Exactly, which is exactly... So... Obviously, the leverage of the patent didn't help the case. Had the plaintiffs, as a result of the settlement, gone from three and a half to five percent, one could say clearly there was some evidence that there was some leverage used. We'll give you the patent only if you pay us more for the rights that we have under the verbal agreement. But the opposite happened. Leverage, the case where the royalty had, had the royalty gone up, I think that there would be at least a prima facie case for some leverage having been used. Let's talk about how this whole thing came out. How that it, that it's, there's a little bit of, no one talked about Brulote even though the case existed at the time. Then it looks like Marble then went into some sort of agreement with Hasbro and they were having to, there was a ten percent issue with Hasbro, right? And then they didn't want, then they, then some attorney at Marble suddenly read Brulote and maybe, had Zila come out at that time? Yes. All right. And said, hey, you don't really, you never really had to, you don't even really have to pay it because the patent's expired now, so let's go talk to them. And so that's how it all came out. Everyone was operating under the agreement that it was just going to go on. But then your client and Marble got into a beef over paying on the royalty, you know, the amount of the royalties and we, and negotiations on that broke down. And then here we are again. Yes, but let me also point out that the original, under the royalty that was awarded by the jury, that royalty would have been paid in perpetuity so long as it made a way. Well, if you'd won an appeal, if you'd won an appeal. Yes, that's correct. But then you both decided, okay, let's settle the case. Let's settle the case. Because I think you were all weary of litigation or something. Well, probably we were more weary than they were. If we look at the positions of the parties at that time, there was an agreement. They had an award of three and a half percent. My clients agreed to less of a royalty to settle. And the same royalty, when Marble went to them and said, we'd like to also have a case. This last settlement, did you do it with the mediation office of the Ninth Circuit, the last settlement, the settlement agreement here? Was that with the settlement agreement with the Ninth Circuit? I do not believe so. I do not believe so. Mr. Kimball will be able to answer that question. Okay. Because I noticed that the parties here said, even though now that we're, now we're embroiled again, that the parties have said to the, that they don't think mediation would help them out here. Well, I don't know. I don't know what the basis of that was. I think that the, the lines are so clearly drawn, the way we view Brulotte, as interpreted by all cases. And if we apply Brulotte. Well, lines are always clearly drawn, but if you listen to questions at oral arguments, sometimes not everyone thinks the court's going to draw the line in the same way that they draw them. Of course. But, you know, the question really should be, in what way does the, a payment of a royalty for a product that has never been patented, a continued payment for that royalty, in what way does that amount to an extension of the patent term? And that is a question that I, an answer to the question that I have not yet seen from oral. Counsel, I'm just wondering, perhaps this is a good time to hear from the other side. You have plenty of, you have plenty of reserved time. Yes. All right. May it please the court. My name is David Fleisher, and I'm here representing Marvel Entertainment today. Mr. Fleisher. The terms of the royalty agreement upon which the appellants rely in this case makes absolutely no distinction between the rates of payment for the patent or products that might not infringe the patent but would otherwise violate the alleged oral agreement. Why does that make any difference? In other words, I think you can see they could use the same rates. Let's say that they set forth in separate parts of the contract, this is what we're doing for the patent, that's 3 percent, and this is what we're doing for the non-patent, that's 3 percent. The fact of the rate, the fact that the rate's identical doesn't make any difference, does it? It wouldn't if that were the facts of this case, but those aren't the facts of this case. The agreement is one flat royalty, and it's 3 percent. Well, this is a peculiar case, but it seems to fall right in the middle of all these Brulotte cases because you have two references in one paragraph. I'm not sure that any case to date fits this scenario precisely. Brulotte is a per se rule, and as this Court in Zyla interpreted Brulotte and Aronson, which is on the other end of the spectrum, two bright line rules exist as a result of the Supreme Court decisions. Well, if it was so bright line, why did you keep paying after the patent had expired? It wasn't until you get into this subsequent brief, you know, I mean, Marvel decides that they don't want to pay anything out of their 10 percent that they're getting from Hasbro. And then someone finally decides, aha, I have a good idea. The patent's expired, and we're not going to pay it anymore. But up until then, you went ahead and paid it, right? Not quite, Your Honor. The patent did not expire until 2010. We never paid royalties after the, stopped paying royalties prior to the expiration of the patent. We were litigating, the counterclaim was for a declaration that when the patent expired, the royalty obligation would terminate. But didn't the beef really come up that you didn't want, you wanted to renegotiate with Kimball about, you know, when she entered into the agreement with Hasbro? You didn't want to continue to pay as much out of the pie? What really went on here, Your Honor, is that over the years, the nature of the WebBlaster product that Marvel was making changed radically from a very simple device, which was essentially a trigger on a can of silly string dressed up with some Spider-Man regalia, into toys that had multifunctions, that shot water guns and darts. And when a dispute arose about whether it was fair under the agreement to be paying a royalty based on the entire sales price of the toy, when the WebBlaster piece of it was a very minor, in the case of the Ultimate WebBlaster, only a fifth of the functionality of the toy, and the parties had those discussions. And those discussions broke down because the plaintiffs insisted that they wanted not only the full purchase price for those multifunction toys, but if we packaged a Spider-Man mask, they also wanted the cost of the Spider-Man mask. And Mr. Durando kept saying that the toys that we were paying royalties on were different than the toy that was being tried. And that's the case. And they were pursuing royalties on all those toys. So the argument that they regarded... So wouldn't that support their argument that they were basing it on the verbal agreement as opposed to the royalty part of it? Because it wasn't the same. They based it on the patent until we asserted the counterclaim. In fact, in the record, Your Honor, there is an e-mail that Mr. Grab sent, and I direct your attention to it. It's in the supplemental appendix at page 25. Supplemental excerpts, excuse me. And this is after the settlement agreement in 2008, at the time the dispute broke out about the royalty payments. And I'm going to quote from page 25. Excuse me, counsel. What's the reference to the ER again? 25.  Oh, SER. Okay. SER. Quote, clearly the ultimate WebBlaster, which was the five-function toy I just described, along with all other WebBlaster products, none of which were the original, currently on the market would infringe the patent. So when Mr. Durando argues that the plaintiffs were not using the leverage of the patent, it's just not true. They used the leverage of the patent when they sued in 1997, when Marvel moved for summary judgment to dismiss the patent claim. They opposed that motion. And when Marvel, when the appeals came out after the jury verdict, they appealed. They used that leverage consistently, not only prior to the time of the settlement agreement, but after it was entered into. Well, the fact that no one mentioned Brulote in the settlement agreement, and it existed at that time, the agreement looks like it's just to pay that amount forever. So why, you know, how does that factor into everything? Because if it was based on the patent, and we know how long the patents last, and that was part of it, why didn't the settlement agreement say that we'll pay this amount until 2010? There's no stopping date in the agreement, right? There is no stopping date in the agreement. And Brulote certainly put everyone on notice. They did, although oddly. I would think Marvel would have some pretty good lawyers if, you know, you make toys and you deal with patents. Well, I can tell you that. You weren't part of the negotiating team, so I know. In fact, I was, but I didn't know about Brulote at the time. And in most of these cases that come to the circuit courts to apply Brulote, they're applying the same principle that Brulote announced in 1964 and invalidating these post-termination royalty payments. It's not unusual for the parties not to factor in Brulote. I mean, Brulote has been criticized, to be sure, by this court, by the Seventh Circuit in Schreiber, which was the most, I think, extreme case. Our case is much easier than either Zyla or Schreiber. You know, in Schreiber, for example, the licensee said instead of they had negotiated a royalty and the licensee said, listen, instead of paying that royalty, let's agree on a smaller royalty, but for a longer period of time. And the court still felt constrained, as this court did in Zyla, to apply Brulote. So in our case, the fact is that we have an agreement that is clearly within the intent of Brulote's per se rule. There's no distinction between post and pre-termination royalties. But again, to my question, if you'd set it out separately, there wouldn't necessarily have to be a difference. I realize that Brulote in some of the cases talk about a difference in royalty, but to my mind, if you make a distinct agreement as to what you're paying for, you can still give the same royalty. I think Your Honor is right. It's a question of fact as to whether the patent leverage is actually being used. And what the courts have said is where the parties don't make that distinction, don't talk about separate royalties, there's a per se rule that applies. I have no doubt that the parties could have, if in fact they weren't, the patent leverage wasn't being applied here, could have entered into an agreement that would have provided for royalties that extended beyond the expiration of the Kimbell patent. But that's not what they did. Well, the odd thing here is that I think, I hope you can appreciate from our perspective, that each party has sort of changed their views as this has evolved. I mean, you said there was no patent, and now it's all about the patents. The jury came back in the original case and said, oh, at the end of that trial, you had no patent rights that were functional and only non-patent rights, and then you settled for everything. So it's kind of a mixed bag here. They didn't have much leverage, did they, at the end of that jury trial, when all you have is non-patent issues? Well, litigation is leverage. There's no doubt about it. And when we settled, when Marvel settled that case, what they were buying was freedom from litigation and freedom from uncertainty and freedom from having to figure out whether this product or that product infringed or didn't infringe. The royalty statements never had a column that said payments under this column are for stuff that infringes the patent or might infringe the patent, and payments in this column are for toys that don't infringe the patent. We bought freedom from all that. A flat royalty is all, and we paid, if the toy shot silly string, we paid. It was only when the plaintiff started to be a little bit hoggish, if you will, and started to claim that they were entitled to the purchase price of these toys that really had nothing to do with the original toy. And I gather from what you're saying, and I appreciate your candor, is that if they still just claimed the silly string, you'd probably just be paying the 3% on those toys and nothing else, right? It depends on whether someone happened to have brought brulette to the attention of someone at Marvel. Basically. No, but as an economic matter. I mean, that's where we are. Likely. As a purely economic matter without any of the background litigation, if they hadn't asked for more than the silly string stuff, you'd probably be paying 3% on that? I could speculate, Your Honor, but I don't think you... Well, but you had the Hasbro agreement, too. I'm sorry. But you had the Hasbro agreement, though, too, which then that was cutting into... Well, the Hasbro agreement, you know, made this considerably more expensive for Marvel than the original deal was contemplated. And when it was done, I don't think anyone fully appreciated the fact that the percentage of Marvel's revenue that was being paid to these plaintiffs, which, by the way, exceeded $6 million over the course of the arrangement. So this isn't a situation where the plaintiffs didn't obtain a huge advantage as a result of this settlement agreement. Counsel, in light of your discussion with my colleagues, I'm wondering if there isn't lurking a genuine issue of material fact here with respect to the leverage. You're here on summary judgment, and there's obviously no finding of fact. Both sides in the district court, Your Honor, agreed that there were no issues of fact. The fact of the leverage is on the face of the record. The quantum of the leverage is really not an issue that you have to get into. Is that a question of law, or is that a question of fact? I think it's a question of law, because once there is the existence of the leverage, and certainly the threat of litigation, and the e-mail I just showed you showed that it continued to be a threat, the Burlatt rule, which is a per se rule, is triggered. It doesn't matter. I don't know how anyone would ever quantify the leverage, but there's no doubt on the face of the agreement there's the leverage. One hundred percent of the royalty payments were designated and stated to be the purchase price for the patent. So I think on the face of the documents there's no issue about the fact that there was leverage. The plaintiffs can argue that the quantum of leverage was not great, but I don't think that matters under Burlatt. Once Burlatt is triggered, there's a bright line rule. If the patent is issued, it's a per se rule, and the royalties can't extend beyond the termination. And in the case of — and rule number two is that the royalty agreement has to distinguish between patent and non-patent rights if it's going to be upheld, and that's the Aronson-Gloss on Burlatt. Anything further, counsel? Not for me, Your Honor. Thank you. Any questions? Mr. Durando, you have some reserved time. If Marvel's position were accepted, one would have to say that every time a patent is part of an agreement, that there is leverage. And that is clearly not the case. Well, no, I think what they're saying is you have to distinguish between patent and non-patent rights if you want to survive Burlatt. That's the other argument. And here, to flip my question around to you, here we have an integrated statement about we're settling this for all 3 percent royalty of everything. So on its face, it looks like a hybrid agreement that would be precluded by Burlatt, even though I take your point that they were distinct intellectual property rights. If you look at every case that deals with hybrid agreements where Burlatt was found to apply, there is always a hybrid product. That is a product that incorporates both patent rights and non-patent rights. The only case where I found where the word hybrid was used where it was really a hybrid agreement because the agreement dealt with both patent rights and non-patent rights, but it was not a hybrid product. It was a California case, a district court case, where Burlatt was found not to apply. So I think that part of the confusion here has been the fact that we've been talking about hybrid agreement as if necessarily they were also involved a hybrid product, which is what Burlatt condemns. In our case, we can clearly see we've got two provisions, a single provision with two arms. One applies to patents with a 3% royalty. The other applies to the Webblast and to non-admittedly a non-patent product. And it's all contained in one section. It's all in one section. See, that's why I find this a little bit, I'm not sure it fits neatly into any category. No, they settled two cases, a patent case and a non-patent case, right? Yes. So the agreement was settling two cases. So I think what he's arguing as a matter of law, the fact that the two cases were settled, one's a patent and one's a non-patent case, that to survive Burlatt, you needed to put something in there to say, you know, this is a non-patent, we're dealing with the non-patent part of it. Well, but the substance of the agreement, we have at the end of the patent, one of the 3% royalties goes away. The only one that remains is the one for non-patented products. And where does that say that in the agreement? It doesn't. That's the law. You stepped it down, though. Yes. So somehow it was factored in that there was. . . That's exactly why it's not in violation. There is a step down. However one looks at it, at the end, per Burlatt, we are not contending that the 3% applicable to a patented product would continue. Well, no, because there are no patented products out there. But if there were. Yeah, I know. If there were. I mean, that's an easy concession to make when the 3% of zero is zero. But it would be the case in any event because of Burlatt. You know, our question is the other side, which clearly pertains to a different category of product, non-patented, why should that go away? Well, isn't the whole point just to settle everything? Yes. I mean, you had some risk on appeal, they had some risk on appeal, and they said we don't want to have to sort out what. . . I mean, I take what your opponent says is accurate. They didn't want to sort out what's patented and not patented. We'll give you 3% of everything. Now, I don't know what to make of that under Burlatt. I don't. Because there's a good argument to be made both sides. It's an integrated agreement and therefore falls under the per se, what's been described as a per se rule. And I appreciate your argument, but I'm not sure where this comes down. Maybe it's time to start talking settlement again. Because all of you are in an all-or-nothing position right now. You're rolling the dice on a lot of money. Well, that's correct, and that's probably why we haven't been able to have any settlement discussions. I think I'm out of time. I've got 20 seconds. Unless your Honor has some more questions. No further questions. Thank you, counsel. Well, you're not on the next one. Thank you. You get to sit down and, I don't know if enjoy, but you get to sit down and observe. You have your question answered? Okay. The case just argued will be submitted for decision.
judges: O'scannlain, Thomas, Callahan